| | |
|---|---|
| MID AMERICAN CONSTRUCTION, LLC | Case No. 2016-00685JD |
|     Plaintiff/Counter Defendant | Judge Dale A. Crawford |
|     v. | <u>DECISION</u> |
| UNIVERSITY OF AKRON | |
|     Defendant/Counter Plaintiff/Third-Party Plaintiff | |
|     v. | |
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND | |
|     Third-Party Defendant | |

**{¶1}** Plaintiff Mid American Construction, LLC (MAC) filed its complaint against defendant, University of Akron (the University), asserting three claims, two breach of contract claims and a claim under R.C. 1311.31. Along with its answer, the University filed a counterclaim and third-party complaint. The University's counterclaim asserts two breach of contract claims and a breach of warranty claim against MAC. The University's third-party complaint asserts two breach of contract claims against MAC's surety, the Fidelity and Deposit Company of Maryland (Fidelity). For the following reasons, the Court hereby renders judgment in favor of MAC in the amount of $2,258,700.

**BACKGROUND**

**{¶2}** MAC and the University executed a contract on December 12, 2014 (the original contract) (Ex. 2) whereby the University agreed to pay MAC a total of $5,137,700 to act the general trades contractor for the Zook Hall Renovation Project

Phase 2B (the project).   MAC was not involved with the project's previous phases. MAC executed a bond, issued by Fidelity, in favor of the University.   MAC's work included, among other items, patching, painting, framing and other carpentry work, tile work, and drywall work. (Ex. 2, p. 131).   MAC performed substantial work on various parts of Zook's interior including the lecture hall and classrooms as well as extensive exterior work expanding and renovating parts of the building's facade, windows and exterior doors.   Mr. Dan Trinetti, MAC's senior project manager, acted as MAC's representative and handled day-to-day operations on the project.

{¶3} The project was a "multi-prime" project, meaning that the University entered into separate contracts with other contractors for fire suppression, plumbing, HVAC, and electrical work.   The University also executed separate contracts with a construction manager, Thomarios, and an architect, Stantec.   Thomarios employed George Brkich as its project manager who was in charge on a day-to-day basis.   Thomarios' responsibilities included coordinating the scheduling and work of all prime contractors including MAC for the express purpose of ensuring completion of the project by the completion date of February 10, 2016.   (Ex. 2, § 6.5 of the general conditions; Contracting Definitions, p. 3 of 10).   Stantec employed Ryan McNutt as its project manager.   Stantec provided architectural design services and construction administration services and contracted with another firm for engineering services. Mr. James Haskell, the University's Director of Campus Planning and Space Utilization, was the University's primary representative during the project.   Messrs. Brkich and McNutt acted, for the first time, in their respective roles.

{¶4} MAC began work on the project in January of 2015.   The original contract provided 401 days, or until February 10, 2016, for completion of the project.   (Ex. 2, p. 2; 29; 138).   As explained more below, the project experienced delay. The University attributed all delay on the project to MAC and stopped paying MAC and its

subcontractors for their work on or around September 30, 2015. On December 18, 2015, the University sent MAC a 5-day notice of termination letter under § 11.3 of the general conditions asserting MAC failed "to prosecute the Work with the necessary force or in a timely manner" and requested a "recovery plan" within 15 days. (Ex. 40). The University also requested that MAC and Fidelity meet with it and representatives from Thomarios and Stantec on December 22, 2015.

{¶5} At the December 22, 2015 meeting, MAC provided a recovery schedule but did not provide a recovery plan. MAC has asserted that it could not provide a recovery plan due to the failure of the University, Stantec, and/or Thomarios to provide responses to requests for information (RFIs) and/or to approve construction change directives (CCDs). Mr. Trinetti presented at the meeting a copy of Zook Hall's floor plan on which he circled areas of the building where outstanding RFIs and/or CCDs, requiring responses from Stantec and/or Thomarios, hindered MAC's work. Stantec informed MAC at the December 22, 2015 meeting that it would be closed from December 22, 2015 to January 4, 2016. Despite this fact, the University wrote MAC a letter the next day in which it granted MAC an extension to provide the recovery plan until December 30, 2015 and indicated "[t]he University is tasking [Stantec] to respond to" several outstanding RFIs. (Ex. 42).

{¶6} On January 7, 2016, the University issued a Notice of Termination (Ex. C) to MAC via email and made demand on Fidelity to complete the contract. MAC did not receive an original signed Notice of Termination until January 13, 2016, four business days later. On or around January 11, 2016, the University refused to allow MAC's subcontractors to work on the project. On this same day, the University sent a letter to MAC informing it that subcontractors should cease work or risk not being paid. (Ex. 61). MAC requested $1.2 million in its pay application for work prior to its termination. (Ex. 261).

{**¶7**} Fidelity agreed to complete the project and entered into a second contract with the University (the takeover agreement) (Ex. 8). The takeover agreement was provided to the University on or around January 13, 2016 but the University did not execute it until February 25, 2016, during which time the project was down per Mr. Brkich's testimony. The takeover agreement did not modify the original completion date of February 10, 2016. Fidelity appointed MAC as the replacement contractor based on completion status, time constraints, and the recommendation of a construction consultant. Fidelity estimated the project was 85% complete at the time of termination.

{**¶8**} The University indicated that contract funds would be released, upon the takeover agreement's execution, which obligated the University to remit the contract balance to Fidelity. (Ex. 8, § 5; 8). On March 15, 2016, the University sent a letter to MAC indicating it would not be paying MAC's recent payment applications based on MAC's termination for cause. MAC left the job site on May 27, 2016 and projected six items that needed to be completed. (Ex. 186). The project was not completed until August 16, 2016, a delay of 188 days from its original planned completion date. The project's 81-page punch list, prepared by Stantec, reflects numerous unfinished items and areas of construction within MAC's scope of work but does not differentiate between MAC's work and the work completed by other contractors after MAC left the job site on May 27, 2016. (Ex. GGG). Mr. Trinetti offered unrebutted testimony that the University never provided the punch list to MAC prior to the filing of this case. The University withheld approximately $2 million from MAC and currently holds the $1.2 million in contract balance funds in an escrow account.

{**¶9**} Mr. Dennis Walsh testified regarding Fidelity's assignment of its claims to MAC. As this testimony is not in dispute and the University offered no evidence to rebut it, the Court finds that Fidelity assigned its rights under the takeover agreement to MAC and, therefore, MAC has the right to pursue claims and collect under both the original contract and takeover agreement.

**CLAIMS**

{¶10} MAC's first claim asserts the University breached the original contract and seeks: $3 million for work performed on the project prior to the issuance of the December 18, 2015 Notice of Termination; extra work MAC performed at the University's direction; and overhead and other consequential and incidental damages. MAC contends the University breached the original contract when it improperly terminated MAC without cause after the project experienced delays attributable to other prime contractors and/or the University. MAC also asserts the University's improper termination resulted in a termination for convenience under the contract and, therefore, that it is entitled to payment for the work it performed. MAC further contends that the original contract's waiver of consequential damages does not apply because the University acted willfully and/or was grossly negligent. (Complaint ¶¶ 7-10; 20-23, 37-43). MAC's second claim, through Fidelity's assignment, seeks an amount in excess of $1 million and asserts the University breached the takeover agreement "by failing to make payment to the Surety and/or its takeover contractor, MAC" and "in failing to provide necessary and requested information to the Surety about the Project status and funding." (Complaint ¶¶ 47-48). MAC's third claim asserts the University violated R.C. 1311.31 in failing to pay subcontractors who filed attested accounts which "caused many of the subcontractors to stop or slow down their work" and cause "MAC to incur additional costs, expenses and time to complete the Project." (Complaint, ¶ 51-59).

{¶11} The University's first breach of contract claim, which seeks compensatory and consequential damages, asserts MAC failed to perform work in a good and workmanlike manner and in accordance with plans and specifications and failed to cooperate with Thomarios in the prosecution and scheduling of work. The University also alleges MAC failed to perform work reflected in the project's punch list and that MAC failed "to properly oversee and supervise its employees and subcontractors" and to remedy deficient work. (Counterclaim, ¶ 10). The University's second breach of

contract claim, which seeks $5,000 per day in liquidated damages for a total of $885,000, asserts MAC failed to staff the project adequately and that MAC's failures delayed the project's completion date to August 16, 2016.  It also seeks indemnification and/or contribution from MAC for additional compensation claims of Thomarios and Stantec due to delayed completion of the project.  Finally, the University's breach of warranty claim asserts MAC breached expressed and implied warranties including the implied warranty to "complete its work on [the] Project in a reasonable and workmanlike manner."

{¶12} The University's third-party complaint's first breach of contract claim against Fidelity seeks recovery based on MAC's failures, as Fidelity's agent, after the University terminated MAC on January 8, 2016 and Fidelity brought MAC back as the replacement contractor pursuant to the takeover agreement.  The University asserts the same breaches as those set forth in its counterclaim against MAC including the failure to perform in a good and workmanlike manner and the failure to perform work in accordance with plans and specifications as reflected in the project's punch list.  The University asserts Fidelity is jointly and severally liable for all damages resulting from MAC's breaches up to the amount of its bond.  The University's second breach of contract claim against Fidelity asserts MAC caused the project's delayed completion and seeks liquidated damages and indemnification and/or contribution resulting from the delay.  The University does not assert any breach of the takeover agreement.

{¶13} The parties' claims are mirror-images of one another.  They involve intertwined issues, whether there was a breach of both contracts by the University in terminating MAC and failing to pay it for 8 months as MAC contends or whether instead MAC and/or Fidelity, based on MAC's poor work performance and/or MAC being the cause of all delay, breached the original contract and justified MAC's termination for cause as the University contends.

## APPLICABLE CONTRACT PROVISIONS

{¶14} The Court finds the following contractual provisions from the original contract applicable to the Court's decision, all of which are contained within the contract's general conditions (Ex. 2, pp. 63-125.):

- Section 3.1.1 states, in pertinent part, "[t]he CM shall provide administration of the Contracts for the Project as provided in the Contract documents."

- Section 3.1.1.4 states, "[t]he CM, in consultation with the A/E, shall render decisions in connection with the Contractor's responsibilities under the Contract Documents and submit recommendations to the Contracting Authority for enforcement of the Contract as necessary."

- Section 3.2.1 states, "[t]he A/E shall assist the CM to provide administration of the Contracts for the Project as provided in the Contract documents."

- Section 3.2.1.4 provides, in pertinent part, "[t]he A/E, in consultation with the CM, shall render decisions in connection with the Contractor's responsibilities under the Contract Documents and submit recommendations to the Contracting Authority for enforcement of the Contract as necessary."

- Section 3.2.2 provides, in pertinent part, "[t]he A/E is the initial interpreter of all requirements of the Contract Documents."

- Section 5.1.1 states:

  The formation of a cohesive, mutually beneficial partnering arrangement among the Contractor, all Separate Contractors, Contracting Authority, CM, A/E, and Owner will accomplish the construction of the Project most effectively and efficiently. This arrangement draws on their collective strengths, skills, and knowledge to achieve a Project of the intended quality, within budget, and on schedule. To achieve that objective, participation in a partnering session is required for [the primary representative of the CM, A/E, Owner and contractors].

- Section 5.1.2 states, in pertinent part, that the partnering arrangement's purpose "is to build cooperative relationships between the Project's key stakeholders, avoid or minimize disputes, and nurture a more collaborative ethic characterized by trust, cooperation and teamwork."

- Section 5.1.3 states, in pertinent part:

  [t]o create and implement the partnering arrangement, the Project's key stakeholders shall meet prior to the construction of the Project for developing a partnering agreement which should be comprehensive and focus on all issues necessary for successful completion of the Project, and shall identify common goals and objectives * * * and an implementation plan for the partnering arrangement.

- Section 6.3.7 states, "[t]he Contractor shall communicate with the Contracting Authority and Owner through the CM."

- Section 6.5.2 states, "[t]he CM shall coordinate the Work with the work of all Separate Contractors and with the activities and responsibilities of the Owner, A/E, and Contracting Authority to complete the Project in accordance with the Contract Documents."

- Section 6.5.3 states, "[t]he CM shall develop and keep current the Construction Progress Schedule in accordance with Section 6.6, and prepare and keep current a schedule of submittals that is coordinated with the Construction Progress Schedule, for the A/E and Contracting Authority's acceptance."

- Section 6.5.5 states, "The CM shall use the Construction Progress Schedule to plan, organize, and execute the Project, record and report actual performance and progress, and show how it plans to coordinate and complete all remaining work by the Contract Completion date."

- Section 6.5.6 states, "[t]he CM shall monitor the progress of the Work for conformance with the Construction Progress Schedule and shall initiate revisions as required by Section 6.6.14."

- Section 6.6.1 states, "[t]he Contractor and each Separate Contractor shall provide information to the CM as the basis of the Construction Progress Schedule for the Project."

- Section 6.6.7 states, in pertinent part, "[w]ithin 30 days of the date of the Notice to Proceed, the CM shall submit to the A/E a proposed Construction Progress Schedule approved by all Contractors."

- Section 6.6.10 states, "[f]or each progress meeting, the CM shall provide a 2- to 6-week look-ahead schedule, as appropriate for the Project."

- Section 6.6.11 states, in pertinent part, "[o]n a weekly basis, the Contractor shall prepare and submit to the CM and A/E a written report describing * * * activities begun or finished during the preceding week * * * activities in progress and expected completion * * * [and] activities to be started or finished in the upcoming 2 weeks."

- Section 6.6.12 states, "[t]he CM shall attach [the information required by 6.6.11] to the minutes of the weekly progress meetings."

- Section 6.6.13 states, "[t]he CM shall provide monthly Progress Status Reports to the Contracting Authority, CM, A/E, and Owner, which shall include recommendations for adjusting the Construction Progress Schedule to meet Milestone dates and the Substantial Completion date."

- Section 6.6.13.1 states, "If it is apparent to the CM or A/E that the Contractor may be unable to meet critical path activities, Milestone completion dates, or the Substantial Completion date, the CM shall direct the Contractor to submit within 3 days a recovery plan to avoid or minimize delay to the Project."

- Section 6.6.13.2 states, "[a] recovery plan shall include, but is not limited to, adjustments to * * * workforce, hours per shift, shifts per workday, workdays per week, equipment, [and] activity logic."

- Section 6.10.2 states:

  [i]f the Contractor finds any perceived ambiguity, conflict, error, omission, or discrepancy on or between any of the Contract Documents, or between any of the Contract Documents and any Applicable Law, the Contractor, before proceeding with the Work, shall promptly submit a Request for Interpretation (RFI) to the A/E, through the CM, for an interpretation or clarification.

- Section 6.10.2.2 states, "[t]he A/E shall respond to an RFI within 3 days of receiving the RFI."

- Section 6.10.2.3 states, "[a]ny interpretation or clarification of the Contract Documents made by any Person other than the A/E, or in any manner other than writing, shall not be binding and the Contractor shall not rely upon it."

- Section 7.1.1.1 states, "[t]he Contracting Authority may order changes in the Work without invalidating the Contract * * * a change in the Work may be accomplished by a Change Order, Change Directive, or order for a minor change in the Work."

- Section 7.1.1.2 states, in pertinent part, "[t]he Contractor shall not proceed with any change in the Work without the Contracting Authority's prior written authorization."

- Section 7.1.1.3 states, in pertinent part, "the Contractor's failure to obtain prior written authorization for a change in the Work constitutes a waiver by the Contractor of an adjustment to the Contract Sum or Contract Times, or both, for the related Work."

- Section 8.7.1 states, in pertinent part:

  it would be difficult, if not impossible, to determine the Owner's resulting damages. Therefore, if the Contractor fails to achieve a Milestone within the associated Contract Time, the Contractor shall (at the Owner's option) pay to or credit the Owner the Liquidated Damages per day sum determined according to the following schedule for each day that the Contractor fails to achieve a Milestone within the associated Contract Time.

  As to a contract with a sum of $5,137,700, this section of the contract provides for $5,000 per day in liquidated damages.

- Section 8.8.1 states, "[e]xcept as provided under Section 8.8.2, the Owner and Contractor each waive against the other all Claims for consequential damages that may arise out of or relate to this Contract."

- Section 8.8.1.2 states, "[t]he Contractor's waiver includes Claims for * * * lost opportunity to work on other projects; losses of financing, business and reputation, loss of profit except anticipated profit arising directly from properly performed Work; [and] loss of bonding capacity."

- Section 8.8.2.4 states the waiver of consequential damages "does not apply to Claims for damages arising from the Owner's or the Contractor's gross negligence or willful misconduct."

- Section 9.4.3 states, "[s]ubject to Section 9.8, the Owner shall pay an approved Contractor Payment Request within 30 days from the date the *A/E* recommends acceptance of the Contractor Payment Request."

- Section 9.4.3.1 states, "[p]ayments due and not paid to the Contractor, through no fault of the Contractor, within the 30-day period shall, from the date payment is due, bear simple interest at the applicable statutory rate."

- Section 9.8.1 states, "[t]he A/E and the CM may recommend to the Contracting Authority that payments be withheld from, or Liquidated Damages be assessed against, a Contractor Payment Request."

- Section 11.2.1 addresses termination for convenience and states, "[t]he Contracting Authority may, at any time, terminate the Contract in whole or in part for the Owner's convenience and without cause, at any time upon 10 days' written notice to the Contractor."

- Section 11.2.3 states, "[u]pon termination, the Contracting Authority shall pay the Contractor in accordance with the Schedule of Values for Work completed, including any retained funds, and the value of materials ordered and delivered, less any salvage credit the Contractor may receive for them."

- Section 11.2.3.2 states, "[t]he Contractor is entitled to a fair and reasonable profit for Work performed and reasonable expenses directly attributable to termination of the Contract. In no event shall the Contractor be entitled to (1) Contractor's Fee on Work not performed or (2) compensation in excess of the total Contract Sum."

- Section 11.3.1 addresses termination for cause and states, in pertinent part, that the University "may terminate all or a portion of the Contract if the Contractor commits a material breach of the Contract including but not limited to * * * failure to prosecute the Work with the necessary force or in a timely manner."

- Section 11.3.2 states that, if the University intended to exercise its termination rights under section 11.3, it "shall issue not less than 5 days' written notice to the Contractor and the Contractor's Surety in accordance with ORC Section 153.17 ('5-Day Notice')."

- Section 11.3.3 states:

  [i]f the Contractor fails to satisfy the requirements set forth in the 5-Day Notice within 15 days of receipt of the 5-day notice, the Contracting Authority may declare the Contractor in default, terminate the Contract, and employ upon the Work the additional force or supply materials or either as appropriate, and remove Defective Work.

- Section 11.3.4 states, in pertinent part, "[i]f the Contract is terminated, the Contractor's Surety may perform the Contract."

- Section 11.3.5 states, in pertinent part, "[i]f the Contract is terminated [for cause], the Contractor shall not be entitled to further payment."

- Section 11.3.6 provides:

  [i]f the Contractor's Surety performs the Work, the provisions of the Contract Documents govern the Surety's performance, with the Surety in place of the Contractor in all provisions including but not limited to, provisions for payment for the Work, and provisions of the right of the Contracting Authority to complete the Work.

- Section 11.3.8 states, "[i]f the Contracting Authority is adjudged to have improperly terminated the Contract under this Section 11.3, the termination will be deemed to have been a termination [for convenience] under section 11.2."

- Section 12.6.1.3 states notice of termination is validly given when sent by email if "the original signed document is delivered within 3 business days after the date of the electronic transmission."

{¶15} In addition, the Court finds the following provisions from the takeover agreement (Ex. 8) applicable to the Court's decision:

- The recitals state, in pertinent part:

  [w]hereas, the Surety, without limitation, undertakes the completion of the Original Contract in accordance with the terms of the Bond and this Agreement, provided that in doing so it will receive the Contract Balance pursuant to the terms of the Original Contract hereinafter defined as set forth below.

- Paragraph 2 states, in pertinent part, "[t]he Surety hereby undertakes to cause the performance of each and every one of the terms, covenants and conditions of the Original Contract, including all modifications thereto, and agrees to be bound by the Original Contract."

- Paragraph 3 states, in pertinent part:

  [t]he Owner agrees that the Contract Balance is dedicated to and will be applied to the completion of the Original Contract pursuant to this Agreement and the Original Contract. The Owner shall pay in accordance with the Original Contract directly to the Surety, or directly to the Surety's designee, the Contract Balance, plus or minus any additional amounts of money on account of any change directives, as the Work progresses. The payment of the Contract Balance to the Surety or its designee shall be made in accordance with the terms of the Original Contract as to the time, amount and method of payment * * *. Notwithstanding any other provision in this Agreement to the contrary, the Owner intends to withhold from monies due surety under this Agreement, that which it may

withhold as a matter of law or that it is permitted to withhold under the Original Contract * * *. Both parties recognize that in doing so neither the Surety nor Original Contractor agrees to or acquiesces to the rights of the Owner to withhold any monies and specifically reserve any and all rights to claim or contest such withholdings.

• Paragraph 8 provides, "[w]ithin three (3) business days of entering into this Agreement, Owner shall submit to the state for processing the application for those funds due under all approved pay applications in the possession, custody or control of Owner received from the Former Contractor. Payment shall be made to the Surety or its designee."

## DELAY

{¶16} Public construction contracts are vast documents containing thousands of construction and procedural details, all of which amount to legal promises, and some of which would be difficult to perform. Business at the construction site is performed by skilled and unskilled workers who seek to coordinate a schedule that is often developed at a laboratory away from the work site and without communication with those individuals putting one brick on top of another.

{¶17} Construction parties include owners, architects, construction managers, schedulers, contractors, subcontractors and workers, all of whom must work with suppliers, budgets, inspectors, a calendar, topography and mother nature to produce a timely product that is scheduled as an educated guess. The product is like a jigsaw puzzle. When one piece is missing or lost, it will be delayed until a replacement is found or made. As Mr. Trinetti testified:

> Again, there was issues that we needed resolved, because I had RFIs outstanding with the architect that we needed answered. Mock-ups approved by the architect in order that we could complete a lot of those submittals. It's no different than a jigsaw puzzle. If you want me to complete the puzzle and you hold onto 10 pieces, I can't complete it.

{¶18} This is a case wherein delays are claimed by the owner to be solely caused by one of its prime contractors. The owner does not claim some of the 188 days of

delay were caused by one contractor, but rather that all the delay was caused by one contractor, MAC. There are a multitude of reasons which may cause delays on construction projects, including:

- Unrealistic schedules;

- Ineffective delay penalties;

- Errors in contract documents;

- Selecting inappropriate project delivery methods;

- Excessive change orders by the owner during construction;

- Delayed payments by the owner;

- Delay in approving design documents by the owner;

- Time consuming decision-making processes by the owner during construction;

- Unnecessary interference by the owner;

- Delay to furnish and deliver the site to the contractor;

- Poor communication and coordination of the owner with designer and/or contractor;

- Poor quality assurance;

- Lack of management staff of the owner;

- Inappropriate construction methods;

- Contractor inefficiency;

- Poor communication and coordination of the contractor with owner and/or designer;

- Inadequate contractor experience;

- Financial difficulties and mismanagement by the contractor;

- Poor site management and quality control by the contractor;

- Legal dispute between designer and owner;

- Design errors;

- Complexities and ambiguities of project design;

- Delays in providing design documents by designer;

- Inadequate experience of the designer;

- Inadequate site assessment by the designer during design phase;

- Misunderstandings between owner and designer about scope of the work;

- Financial difficulties with the designer;

- Poor communication and coordination of the designer with owner and/or contractor;

- Legal disputes between designer and the owner;

- Delay in getting permits and acquisitions.

Mohammadsoroush Tafazzoli, et al., *Investigating Causes of Delay in U.S. Construction Projects,* 615 (2017) available at http://ascpro.ascweb.org/chair/paper/CPRT190002017.pdf (accessed August 20, 2018). *See also* James Owolabi, et al., *Causes and Effect of Delay on Project Construction Delivery Time*, 2 International Journal of Education and Research 197, 203-205 (2014) (Discussing 15 reasons construction projects experience delay). *See also Evid R. 201.* Delays can be excusable and inexcusable, compensable and non-compensable. Delays can be caused by one source, i.e. slow decision making or concurrent sources, i.e. slow decision making and project management problems.

{¶19} In order to justify its termination of MAC and to obtain compensation the burden is on the University to prove that MAC was solely or substantially at fault for all the delays. The University has not met its burden of proof. The Court has reviewed the evidence and the credibility of the witnesses and has determined that, while the delays grew to be compensable delays, they were not all caused by one source, but concurrent sources not able to be individually quantifiable. Among others, these concurrent sources include: delays by Stantec and/or Thomarios in responding to RFIs and in executing CCDs; the lack of coordination among the prime contractors and problems

with the schedule both Thomarios' responsibility; the University's failure to pay MAC after September 30, 2015; and unforeseen and/or unanticipated conditions which arose during construction.  The evidence established the following:

- Thomarios issued a 72-hour notice to MAC on or around August 19, 2015 noting construction activities behind schedule.  (Ex. OOO).  Mr. Brkich first became aware the project was behind schedule on the 5th or 6th of September.  He testified MAC was 23 days behind schedule by the end of October of 2015.

- MAC and other contractors could seek clarification on conflicts, discrepancies and ambiguities in the Contract Documents through requests for information (RFIs).  Stantec had three days to respond to RFIs.  (Ex. 2, General conditions § 6.10.2.3; Contracting definitions, p. 7 of 10).

- According to the request and answer log for the project (Ex. R), the contractors, sent 144 RFIs to Stantec from the beginning of the project in January of 2015 to the conclusion of the project in April of 2016.  A review of the log indicates that 69 were answered on time while 75 were not.[1]  The log contains a heading titled "work impact."  As to those RFIs not answered on time, 45 are noted as "work impeded" while the remainder are marked "unknown."

- From September of 2015 when questions first arose regarding the progress of MAC's work until the issuance of the termination letter on December 18, 2015, which appears to be the critical time-period in determining whether defendant properly terminated plaintiff for cause, 14 RFIs were answered on time and 23 were not.

- In some cases, weeks and even months would elapse with no response to MAC's RFIs.

- MAC did not receive a response to RFI No. 44 dated May 5, 2015, related to the removal of perlite concrete and other materials from Zook Hall's existing roof, until May 29, 2015 which hindered the progress of MAC's work in this area. (Ex. R; 17-19).

- RFI # 27 dated March 25, 2015, was responded to April 8, 2015 (Ex. R) and a CCD relative to this RFI was issued unsigned on February 9, 2016 which delayed work in the IT room.

---

[1]The log reflects 11 RFIs that do not indicate any response date.  The Court included these entries in the total of RFIs for which responses were untimely.

- Absent a signed construction change directive (CCD), MAC could not proceed with changes to its work which differed from that set forth in the contract. Otherwise, MAC would waive any right to additional payment and/or adjustment of completion time. (Ex. 2, § 7.1.1.2 and § 7.1.1.3 of the General Conditions).

- CCDs would be returned to MAC unsigned. The University, through Thomarios and Stantec, (Ex. 53; 68) issued unsigned change directives 88 (Ex. 53) and 89 (EX. 68) in January of 2016 requesting a change to MAC's work months after last paying MAC in September of 2015.

- CCD # 94, related to an issue in the mail room, was unsigned and was provided to MAC 11 months after the RFI was first submitted.

- The University continued to delay providing signed change directives to MAC even after execution of the takeover agreement.

- MAC continued to seek resolution of CCDs into April of 2016. (Ex. 140).

- Thomarios failed to conduct a partnering session with the prime contractors to develop a coordinated schedule plan as required by § 5.1.3 of the original contract.

- Though § 6.6.7 of the General Conditions required a proposed schedule within 30 days of the notice to proceed dated January 5, 2015, the baseline schedule was not approved until April 16, 2015 which Mr. Haskell admitted could have caused delay.

- There were instances when the status of other prime contractor's activities was not properly reflected on the project's schedule.

- Mr. Tom Cooke of Western Reserve, one of MAC's subcontractors, testified that he had never, in 40 years of construction work, been on a job that was coordinated so poorly.

- Mr. Brkich testified to delay resulting from the "stacking" of the prime contractors' work such that their work overlapped with one another on the same floor of Zook Hall, resulting in delay. He testified little work was completed during this time-period, that the situation was simply "not good" and that it resulted from the work of all contractors, not just MAC.

- An April 14, 2016 email from Mr. Ted Whitcomb, Thomarios' scheduler, regarding schedule update 12 notes that, except for MAC, none of the prime contractors provided the information necessary to generate an accurate schedule update. He states he could only "guess at all of [the] start dates" for Hampton and Didado

and that he received no information from Comunale and that he had "no confidence that this update means anything at all."

- The University, during negotiations on Stantec's request for additional compensation, attributed Stantec's request for additional compensation for submittals to Stantec's own errors and omissions and Mr. McNutt admitted there were design errors and omissions.

- Mr. Trinetti offered unrebutted testimony that construction drawings for the project were missing pertinent details including those related to structural steel support as well as details regarding the project's staging area.

- Section 6.6 required Thomarios to develop the project schedule and required all contractors, including MAC, to provide weekly status reports regarding completed and anticipated work. Mr. Brkich testified that, of the prime contractors, only MAC provided weekly written status reports; all other contractors provided verbal reports despite the requirements of § 6.6.11. MAC never received weekly status reports from other contractors and weekly status reports were not attached to meeting minutes as § 6.6.12 required.

- Despite the requirements of § 6.6.13, Thomarios did not provide monthly progress reports, which delayed MAC's work.

- On or around February 4, 2016, it was decided that all prime contractors would update their schedules with information on completed and projected work. MAC never received updated schedules from the other prime contractors or any explanation why these schedules were not provided. Mr. Trinetti testified that drywall work could not commence if MAC did not know if other primes had completed their work and passed inspections. As Mr. Trinetti testified, "their work is affecting our work."

- Thomarios failed to provide the 2-6 week look ahead schedule at the weekly progress meetings as required by § 6.6.10.

- After Western Reserve installed ceiling tiles, workers with other prime contractors damaged the tile while performing their own work in the ceilings, resulting in additional work on the tiles in the Spring of 2016. The lack of coordination among the contractors and delays obtaining inspections also delayed work on the ceiling tiles.

- Issues related to the use of salvaged stone delayed the completion of the southeast storefront area which, in turn, affected permanent enclosure of the building. After MAC received a late response to RFI # 99, it found that the

salvaged stone it was directed to use was not suitable. Consequently, MAC issued RFI # 108 on December 4, 2015, to which Stantec did not respond until December 23, 2015.

• MAC discovered existing conditions, after performing demolition in the southeast storefront area, which delayed work on the storefront. It is undisputed that Ryan Diperna, on behalf of Thomarios, failed to forward an October 30, 2015 change directive related to these issues until February 23, 2016 (Ex. 89 and 104). A signed CCD, # 79, was not executed until March 25, 2016. (Ex. 126 and Ex. 130).

• The demolition contractor removed areas of ductwork that were not supposed to be removed resulting in additional work for MAC as reflected in CCD # 82. (Ex. 248, Tab 38).

• MAC's work in the lecture hall suffered from delay due to unanticipated patching work necessitated by the abatement contractor's demolition work in this area and additional framing in the projector room outside of MAC's original scope of work. Other contractors' work on raceways and cables delayed MAC's ability to complete its ceiling and drywall work as did delays associated with inspections of the other contractors' work. Though MAC alerted Thomarios and/or Stantec to issues in the lecture hall in April or May of 2015, these issues lingered into the spring of 2016 and ultimately delayed MAC's ability to finish its work in this area.

• Issues with diffusers and light fixtures, the responsibility of another contractor, delayed MAC's work on parts of the ceiling.

• The failure of the University to pay MAC's subcontractors contributed to the project's delay. As Mr. Trinetti testified, energizing and motivating the subcontractors to complete work, in the absence of payment, was challenging. (Ex. 44, ¶ 5).

• Mr. McNutt, Stantec's project manager, could not attribute every day of delay to MAC.

• MAC moved 20-foot tall mixing silos at the request of the University because the silo's location disturbed the University's president view. MAC received a change order for this work which delayed MAC's work on the foundation of the north addition.

• Delayed resolution of issues with the operable windows resulted in the operable windows being shipped very late, after January 1, 2016.

- Elevator inspections were delayed because the elevator company would not proceed with inspections until it was paid.  After the University requested that MAC paint the elevator pits, the untimely execution of a CCD on this issue delayed MAC's painting of the pits.

- MAC communicated with the University continuously regarding its need for additional information and/or resolution of outstanding RFIs and CCDs.

{¶20} The curtain wall portion of the project and the parties' disagreement during the project regarding the requirement of window blocking exemplify the concurrent nature of the project's delay.  Evidence established the following:

- The curtain wall was to be completed by December 21, 2015; it was not completed until March 23, 2016.

- MAC issued RFI # 33 related to the north addition curtain wall on April 15, 2015 and received a response on April 20, 2015.  (Ex. R).  MAC's weekly status reports, however, list the resolution of this RFI as a deficiency impairing planned accomplishments until November of 2015.  (Ex. 31; 35-36).

- Mr. Trinetti testified that MAC needed additional details on how to attach the curtain wall system to the east and west wings and that the architect failed to return a submittal related to aluminum samples for weeks which prevented materials from being ordered.

- The University presented evidence that MAC and/or its subcontractor, Glazing Systems, failed to obtain required guidance from their own engineer and/or failed to tender submittals for months with required engineer approval and proper calculations.

- MAC and the University disagreed for weeks regarding whether the contract documents required window blocking.  While MAC felt that the contract documents did not require this window blocking, Stantec and the University felt it was required by the contract and that MAC wanted more compensation because the blocking was more than MAC anticipated.

- The contract documents do note that "CONTRACTOR TO PROVIDE ALL REQUIRED BLOCKING FOR WINDOW STOREFRONT AND CURTAINWALL INSTALLATIONS.  INSTALL ACCORDING TO MANUF. INSTRUCTIONS." However, Mr. Trinetti testified that the project drawings themselves did not show blocking and that the window manufacturer did not require blocking.

{¶21} Neither party convinced the Court that the other should bear sole blame for the curtain wall's delay or any delays resulting from the window blocking disagreement. Rather, the evidence established that the parties attempted to resolve a good faith disagreement about work on the project through contractual procedures and that concurrent causes contributed to delay these parts of the project. As Mr. Trinetti testified:

> There were a number of issues, questions, some raised on the shop drawing review process, some raised in RFIs. There was material reviews * * * if I could summarize, it was like a pot of soup. It takes a lot of ingredients to make soup. And we had all those ingredients that had to come together in order for us to complete the whole entire curtain wall system.

More importantly, the delayed resolution of these issues, which did delay the project's completion, cannot be solely attributed to MAC.

{¶22} Regarding delays during the project, the Court finds that Mr. Trinetti, as MAC's primary witness, was credible and persuasive. He provided detailed and thorough explanations for the various issues which arose during the project. He was not evasive when asked tough questions and he exhibited a patient and frank demeanor which made a strong impression on the Court and buttressed his testimony. Mr. Trinetti testified extensively over two days and his answers were consistent throughout. He acknowledged problems with the project but provided convincing testimony and specific examples that the project's delay was not solely the fault of MAC's but rather the result of several concurrent actions and inactions including those of Thomarios, Stantec, and the other prime contractors as well as unforeseen conditions which none of the parties could have anticipated and which the evidence established often arise during remodeling projects of this nature. Documentary evidence, including the RFI log and extensive correspondence between the parties, supported his testimony.

## EXPERT TESTIMONY

{¶23} Mr. James Dougherty testified as MAC's expert. In rendering his analysis and opinions, Mr. Dougherty used software known as Primavera P6, an industry accepted software used to produce and analyze construction schedules and the same software used to create the Zook Hall baseline schedule. Mr. Dougherty analyzed schedule update # 8, dated November 30, 2015, using the Primavera software self-diagnostic tools. This schedule update, prepared by Thomarios, indicated the project was 82 days behind schedule with an end date of May 2, 2016. Mr. Dougherty testified a well-produced schedule should only have two "open ends," the project's start and completion dates and that all other activities should have a relationship to a predecessor and successor activity.

{¶24} Mr. Dougherty's analysis revealed schedule update # 8 contained 34 out of sequence activities, 32 activities without predecessors, and 29 activities without successors. Of the 34 out of sequence activities, 19 were associated with prime contractors other than MAC. Of the 32 activities without predecessor activities, 13 were associated with other primes. Mr. Dougherty testified that the project's projected end date of May 2, 2016 reflected in schedule update # 8 was being driven by the work of the mechanical, electrical and plumbing contractors and unresolved CCDs, particularly CCD # 89, and that the work of the other prime contractors did not show any progress from update # 7 to update # 8. After addressing these errors through the Primavera software by establishing relationships for the out-of-sequence activities associated with MAC, the software recalculated the schedule's completion date to be February 20, 2016, reflecting that the project was only 10 days behind. However, Thomarios chose to continue with its own schedule and, therefore, these same errors appeared in schedule update # 9. Mr. Dougherty also testified a proper and accurate schedule is needed to formulate a recovery plan and that the schedule's various errors hindered MAC's ability to provide one.

{¶25} Mr. Robert Kelly testified on behalf of the University. Mr. Kelly's opinion focused on the progress of the curtain wall and enclosure of the building. He opined that the lack of enclosure during the winter of 2015-2016 prevented progress in parts of the building which were still exposed to outside conditions. Mr. Kelly's testimony was not as thorough as Mr. Dougherty's and his demeanor and explanations seemed much less objective than Mr. Dougherty's. Mr. Kelly pointed to specific portions of MAC's work, the curtain wall and building enclosure, and testified that the delay of these portions of the project caused all delay of the project's completion. Unlike Mr. Dougherty who testified regarding the relationship between activities, Mr. Kelly did not address the "jigsaw puzzle" nature of the project or the effect of the actions of other contractors identified by both parties' witnesses and by Mr. Dougherty. Mr. Kelly did not rely on the baseline schedule because of errors but did not address either the errors in the schedule or the analysis Mr. Dougherty undertook using the same software employed to generate the project's schedule. In the most conclusory fashion and without any detailed explanation, Mr. Kelly testified that late responses to RFIs and CCDs had no effect on the project's completion date, despite that MAC's curtain wall work involved several RFIs and CCDs and Mr. Kelly's acknowledgement that responses to RFIs and the execution of CCDs were often untimely. In a similar fashion, he testified that Thomarios, Stantec, and the University did not contribute to the project's delay in any way. Despite his opinion, he recognized that a week's worth of delay resulted from the electrical contractor's work at the end of the project, that MAC could not proceed with work absent signed CCDs, and that the baseline schedule was flawed and that Thomarios could have done a better job in creating the schedule including relying more on logic, i.e. tying activities to one another as Mr. Dougherty did in his analysis. In fact, when asked, Mr. Kelly could not say if the building would have been completed on time even if MAC's work on the north addition curtain wall was completed on time.

{¶26} Mr. Dougherty provided more credible and convincing testimony than Mr. Kelly for which he offered greater support and factual detail.  Both his demeanor and tone while testifying and his more objective testimony and explanations causes the Court to attribute more weight to his testimony.  Mr. Dougherty's experience and qualifications were more significant than those of Mr. Kelly.  He had an actual defined methodology, using the critical path method and the Primavera software, which seems to be the industry standard and, at any rate, was the software used on this project.  Mr. Kelly, on the other, hand advocated more than he testified and did not appear objective or unbiased and his testimony was conclusory.

## BREACH CLAIMS

{¶27} MAC's claims are based on 2 separate contracts.  As to the original contract, MAC asserts that, pursuant to Article 11.3.8 of the general conditions, it was terminated for convenience and is, therefore, entitled to payment for all work performed pursuant to Article 11.2.3 and 11.2.3.2.  MAC further asserts that the project's delay is attributable to causes beyond its control including actions and conduct of Thomarios, Stantec, and the other prime contractors.  The University contends it terminated MAC for cause under § 11.3 of the general conditions which provides that the University "may terminate all or a portion of the Contract if the Contractor commits a material breach of the Contract including but not limited to * * * failure to prosecute the Work with the necessary force or in a timely manner."  (Ex. 2, § 11.3.1.1).  Further, as both a justification for terminating MAC and for seeking liquidated damages, the University attributes every day of delay to MAC alone.  The University, in failing to pay for work under both the original contract and the takeover agreement and in seeking liquidated

damages, is attempting to rely on the February 10, 2016 completion date set forth in the original contract.[2]

{¶28} The Court finds the state breached the original contract when it ceased paying MAC in September of 2015 and when it terminated MAC without pay in January of 2016. The Court also finds that the state failed to prove that MAC failed to prosecute its work under § 11.3.1.1. Plaintiff established that multiple actions and events, including many attributable to Thomarios, Stantec and the other prime contractors, contributed to the project's dysfunction and ultimately to the delay of the project's completion. Further, though MAC did not complete the entire project, MAC substantially performed under the original contract and any failure to complete work after its walk-off in May of 2015 was excused.

> It is well-established that where a party makes an honest effort to perform its contract, and does not willfully refuse to perform, substantial performance is all that is required to entitle the party to some portion of the total contract price. *Ashley*, *supra*, at 569; *Cleveland Neighborhood Health Serv.*, *supra* at 644. Substantial performance is an approximation of full performance so that the parties obtain, in main, what the contract called for, although it is not complete and full performance in every particular. *State v. Brand* (1981), 2 Ohio App.3d 460, 464, 442 N.E.2d 805 n.4. Whether performance is substantial is a question of fact that depends on the particular circumstances of the case. 2 *Farnsworth on Contracts* (1990) 416, Section 8.12; *Jacob & Youngs, Inc. v. Kent* (1921), 230 N.Y. 239, 129 N.E. 889 (Cardozo, J.) ("Where the line is drawn between the important and the trivial cannot be settled by a formula * * *. The question is one of degree, to be answered, if there is doubt, by the trier of fact * * *").

---

[2]The original February 10, 2016 completion date was impossible at the time the University executed the takeover agreement. While the takeover agreement did not set forth a new completion date, clearly Fidelity could not be responsible for the original completion date. *See Nat'l Pumps Corp. v. Am. Pumps, Inc.*, 66 Ohio App. 175, 178, (1940), *judgment rev'd on other grounds*, 138 Ohio St. 311 (1941) ("Impossible conditions, of course, cannot be performed, and if a person contracts to do what at the time is absolutely impossible, the contract will not bind him because no person can be obliged to perform an impossibility."

*Stawser v. Vulic*, 10th Dist. No 92AP-1640, 1993 Ohio App. Lexis 3226, at *20-21 (June 22, 1993).  *See also Kersh v. Montgomery Developmental Center*, 35 Ohio App.3d 61, 62 (10th Dist.1987); *Rhodes v. Rhodes Industries, Inc.*, 71 Ohio App.3d 797, 887 (8th Dist.1991).

{¶29} The responsibility for coordinating the prime contractors and the responsibility for generating an accurate and reliable schedule rested with Thomarios. As outlined above, the evidence established multiple problems and failures with regard to scheduling and coordinating the prime contractors' work including contractual requirements germane to scheduling which Thomarios did not perform.  MAC's expert provided convincing testimony regarding a multitude of problems with the project schedule which Thomarios failed to remedy.  The project involved multiple prime contractors whose schedules and work were not properly coordinated and inexcusable delays of both Thomarios and Stantec in responding to and communicating with regard to RFIs and CCDs contributed to delay MAC's work and the project's completion. Unforeseen conditions, which became apparent during construction, also caused delays.

{¶30} While the Court has found that the University breached the original contract in terminating MAC and withholding payment from MAC beginning on September 30, 2015, it also finds that the University failed to provide timely written notice of termination as required by § 11.3.2 of the General Conditions.  As the University did not terminate MAC for cause and failed to provide proper notice the University's termination of MAC was a termination for convenience which entitles it to payment for all work performed per §§ 11.3.8 and 11.2.3.

{¶31} As for the takeover agreement, the Court finds the University had an obligation to pay the contract funds to Fidelity and that the University breached the takeover agreement in not paying Fidelity.  The Court further finds that the state's failure to pay under the takeover agreement justified MAC's walk-off from the job site in May of

2016. It is the Court's belief that the University had no intention to pay Fidelity after execution of the takeover agreement. In addition to the takeover agreement's plain language, MAC presented evidence, including the testimony of Mr. Walsh, that it was the expectation that the University would provide the contract funds after the execution of the agreement. Yet, the University delayed its execution of the takeover agreement for weeks and did not remit a single payment after the takeover agreement's execution. In response to questions from the Court, Mr. Haskell testified that, after MAC's termination, he decided MAC should be assessed liquidated damages on a per diem basis and that, when Fidelity took over the project, he intended to consider offsets to payment applications as the applications came due. Thus, the University intended to offset any payment applications after the January 2016 takeover agreement with liquidated damages. Yet, the University did not inform MAC and/or the surety of its intent to not pay MAC until it sent the March 15, 2016 letter. Mr. Haskell also testified that, though § 9.8 of the original contract's General Conditions provided Thomarios and/or Stantec could make recommendations on withholding payment and/or assessing liquidated damages, neither were consulted. Mr. Haskell alone made this decision on behalf of the University. While this somewhat egregious action on the University's part took place, it is not relevant to any further findings of the Court.

{¶32} MAC justifiably left the jobsite on May 27, 2016, after it was not paid for 8 months and after the University breached both the original contract and the takeover agreement. The claim that MAC was on schedule near the beginning of September of 2015 but, approximately a month and a half later, was more than 83 days behind seems implausible. It is even less plausible that the project's delay during this critical time, regardless of the length of the delay, can be solely attributed to MAC given the evidence as outlined herein. As MAC did not fail to prosecute the work and concurrent causes contributed to the project's delay, the state breached both contracts when it terminated MAC without pay and refused to release the contract funds to Fidelity.

{¶33} Though the University was incorrect in attributing all delays to MAC, the Court finds that MAC failed to prove the breach amounted to willful misconduct or gross negligence. The University simply took an incorrect position, albeit one that the University indicated it believed correct at the time. Moreover, the complexity of the project and the fact it was a multi-prime project presented a challenge to all parties once delay began to take hold, a challenge which cannot be solely attributed to the University, just as it cannot solely be attributed to MAC. Further, notwithstanding delays associated with the process, MAC did issue a substantial amount of RFIs and there is at least some basis for Stantec's position, as testified to at trial, that some of the RFIs were duplicative and/or should have been resolved through MAC's consultation of the contract documents. In short, though unjustified in terminating MAC without pay and blaming MAC for the entire delay, the Court does not find that the University actions were taken to intentionally cause damages to MAC or amounted to gross negligence.

{¶34} For these same reasons, MAC is entitled to judgment on the University's counterclaims and Fidelity is entitled to judgment on the University's third-party claims. As the Court has already found, MAC substantially performed its obligations under the original contract, which was incorporated into the takeover agreement, and the University breached both the original contract and the takeover agreement. In addition, the project's delay resulted from concurrent causes including actions attributable to the University through Thomarios and/or Stantec. The University's failure to pay MAC for 8 months and failure to pay under the takeover agreement justified MAC's walk-off from the job in May of 2016. In sum, having failed to perform its obligations under both contracts, a necessary element to any breach of contract claim, the University cannot recover for breach of contract.

{¶35} The University also failed to present sufficient evidence that MAC failed to complete its work in a good and workmanlike manner and, therefore, its breach of warranty claim also fails. Though the University presented evidence of punch list items

which required additional work after MAC left the job site in May of 2016, it did not establish that MAC performed shoddy work. Rather, the University's evidence, at most, established that some work needed completed due to the University's own breach in terminating MAC and not paying it for 8 months which caused MAC to leave the job site.

**R.C. 1311.31**

{¶36} MAC brings its third claim under R.C. 1311.31 which provides, in pertinent part:

> The public authority, upon the receipt of the affidavit referred to in section 1311.26 of the Revised Code shall * * * serve the principal contractor with a copy thereof, within five days after the public authority receives it, together with a notice that the principal contractor must give notice of his intention to dispute the claim within twenty days * * *. If the principal contractor fails within twenty days after receipt of the affidavit to serve to the public authority written notice of his intention to dispute the claim, he has assented to its correctness * * *. Thereupon, provided all affidavits filed on the same public improvement have been assented to, the amount detained from the principal contractor shall be applied by and payment made by the public authority, in the order of preference provided in section 1311.29 of the Revised Code, pro rata, upon the claims on which affidavits have been filed.

{¶37} MAC failed to demonstrate how any violation of this statute entitled it to damages different than those resulting from the University's breach of contract. The statute's plain language provides no right of recovery to MAC. In fact, as MAC states in its post-trial brief, the "enforcement of a statutory violation may be a claim better asserted by subcontractors who did not receive payment." The Court finds any claim under this statute resides with subcontractors who did not receive payment and not with MAC. While the Court has found that MAC received an assignment of Fidelity's claims, MAC presented no evidence that any subcontractor assigned its claims to MAC and, therefore, MAC has no right to assert any subcontractor's claim under R.C. 1311.31. As such, the University is entitled to judgment on this claim.

**DAMAGES**

{¶38} Given the assignment of Fidelity's claims to MAC and the Court's finding that the state breached the original contract and the takeover agreement, there is no need to differentiate the damages as to either contract. The Court's obligation is to place MAC in the same position it would have occupied if the University had performed under the contract. "[T]he extent of damages suffered by a plaintiff is a factual issue, it is within the jury's [or fact finder's] province to determine the amount of damages to be awarded." *Arbino v. Johnson* & *Johnson,* 116 Ohio St.3d 468, 475, 2007-Ohio-6948, 880 N.E.2d420 (2007). "Where a right to damages has been established, such right will not be denied merely because a party cannot demonstrate with mathematical certainty the amount of damages due." *Tri-State Asphalt Corp. v. Ohio Dept. of Transp.,* 10th Dist. No. 94API07-986, 1995 Ohio App. LEXIS 1554 (Apr. 11, 1995), citing *Geygan v. Queen City Grain* Co., 71 Ohio App.3d 185, 195, 593 N.E.2d 328 (12th Dist.1991). Furthermore, "a party seeking damages for breach of contract must present sufficient evidence to show entitlement to damages in an amount which can be ascertained with reasonable certainty." *Id.* at 14.

{¶39} MAC seeks "its costs to complete the project * * * in [the amount of] $2,580,409.99." (MAC's post-trial brief, p. 21). The Court finds that the contract balance is the only amount to which MAC established it is entitled with reasonable certainty. The evidence established $2,879,000 million was paid to MAC, leaving a balance owed on the contract of $2,258,700. MAC did not provide the Court with sufficient evidence to a reasonable certainty that they expended funds beyond the original contract amount and, therefore, the Court is unable to award a different amount. MAC has proved beyond a reasonable certainty that it performed sufficient work and expended sufficient funds to entitle it to the contractual sum. In addition, § 11.2.3.2 provides that, when terminated for convenience, MAC is not entitled to "compensation in excess of the total Contract Sum."

{¶40} In asserting entitlement to damages over and above the contract amount, MAC primarily points to Exhibit 259, a spreadsheet which it asserts reflects its damages. MAC provided insufficient and conclusory testimony on this exhibit and the numerical figures contained therein. While Exhibit 259 does contain a number equal to the total amount of damages MAC seeks, 2,580,409.99, next to a notation stating, "Balance Owed," it does not establish the relation of these costs to the project or explain why they were incurred. The exhibit does not support the value of the figures reflected therein or explain how the value was determined. And, the exhibit contains figures which the Court finds do not represent compensable damages MAC incurred because of the University's breach. For example, there are notations of $30,000 and $97,992 respectively labeled "WRI claim" and "Duer claim" which appear to reflect claims of MAC's subcontractors including Western Reserve Interiors. The testimony MAC presented at trial did not resolve any of these issues. In short, the spreadsheet and other evidence MAC presented as to damages for work above and beyond the contract sum failed to establish both MAC's entitlement to these amounts and the reasonable value of the amounts.

{¶41} Though MAC also presented evidence of a decrease in working capital, a decrease in net worth before and after the project, and other claimed consequential damages, MAC failed to present expert testimony or any other evidence establishing the University's breach caused these damages. Further, though consequential damages can be recovered in a breach of contract action if reasonably anticipated by the parties, the parties contract bars MAC from recovering consequential damages absent gross negligence or willful misconduct, which MAC failed to prove. (Ex. 2, § 8.8 of the General Conditions).

{¶42} The University seeks recovery for additional costs it incurred to complete and/or to remedy MAC's work. The court has found that MAC justifiably left the job site in May of 2016 and, therefore, was not in breach of either contract, in failing to complete

some remaining work on the project. The evidence established the University's ongoing failure to pay for work on the project and the continued delay resulting from problems with coordination and the schedule as well as the CCD and RFI process did not only justify MAC's walk-off; it also prevented MAC from completing its work. *See Kersh; Rhodes, supra.* Thus, the University is not entitled to recover from MAC additional costs to complete the contract.

{¶43} In addition, apart from finding that the University, and not MAC, breached the two contracts, the University failed to differentiate between the work of MAC and that of other contractors who completed work after MAC justifiably walked off the job in May of 2016. Moreover, the Court finds the evidence of the value of many of these items and the relation of the items to MAC's work is not entitled to much weight and failed to establish a proper basis for offsetting the damages to which MAC is entitled. For example, Mr. Haskell testified to using internet searches to determine the value for some work items and testified to costs for University security and locksmiths which are unrelated to MAC's work. Finally, the University never provided Stantec's punch list to MAC, depriving it of the opportunity to address the items set forth therein.

{¶44} Though MAC is entitled to judgment, the Court will briefly address the University's attempt to seek liquidated and compensatory damages. The University has sought to assess liquidated damages, of $5,000 per day, against MAC from February 10, 2016 until occupancy on August 5, 2016. A non-breaching party may not recover both compensatory and liquidated damages which the University is attempting to do. *Boone Coleman Constr., Inc. v. Vill. of Piketon,* 145 Ohio St.3d 450, 2016 Ohio 628, ¶¶ 11-12; 15. Thus, while the Court may find the liquidated damages clause enforceable, it is impermissible to seek both liquidated and compensatory damages. Finally, liquidated damages are not available where the party seeking to impose them is found to have contributed to an unreasonable delay. *Mt. Olivet Baptist Church, Inc. v.*

*Mid-State Builders,* 10th Dist. No. 84AP-373, 1985 Ohio App. Lexis 9120, at *19-20* (Oct. 31, 1985).

**CONCLUSION**

{¶45} The Court finds that the University breached its contracts with MAC and the Surety and assesses damages in the amount of $2,258,700. The Court further finds in favor of MAC on the University's counterclaims.

DALE A. CRAWFORD
Judge

[Cite as *Mid Am. Constr., L.L.C. v. Univ. of Akron*, 2018-Ohio-4513.]

| | |
|---|---|
| MID AMERICAN CONSTRUCTION, LLC | Case No. 2016-00685JD |
| Plaintiff/Counter Defendant | Judge Dale A. Crawford |
| v. | <u>JUDGMENT ENTRY</u> |
| UNIVERSITY OF AKRON | |
| Defendant/Counter Plaintiff/Third-Party Plaintiff | |
| v. | |
| FIDELITY AND DEPOSIT COMPANY OF MARYLAND | |
| Third-Party Defendant | |

**{¶46}** This case was tried to the Court.  The Court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiff Mid American Construction, LLC, in the amount of $2,258,725 plus statutory interest prorated from the due date of the invoices billed and not paid, which includes the filing fee paid by plaintiff.  Court costs are assessed against defendant University of Akron.  The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

DALE A. CRAWFORD
Judge

Filed October 1, 2018
Sent to S.C. Reporter 11/8/18